

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  5/4/2020

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 22, 2020

David Braff, Esq.
Aisling O'Shea, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004

Avi Gesser, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022

Accepted by the Court for the reasons stated on the record at the April 30, 2020 hearing.
SO ORDERED.

Date:  5/4/2020
New York, New York

Mary Kay Vyskocil
United States District Judge

> Re:   *United States v. Bank Hapoalim B.M.*, 20 Cr. _____ ( )
>        Deferred Prosecution Agreement

Dear Counsel:

The United States Attorney's Office for the Southern District of New York (the "Office") and the Tax Division of the United States Department of Justice (the "Tax Division") (together with the Office, the "Department") and the defendant Bank Hapoalim B.M. ("BHBM" or the "defendant" and, together with all of BHBM's subsidiaries, branches, representative offices, and predecessors in interest, the "Bank"), under authority granted by its Board of Directors in the form of a Board Resolution (a copy of which is attached hereto as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement").

This Agreement shall take effect upon its execution by all parties.

### THE CRIMINAL INFORMATION

1.        BHBM waives indictment and consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging BHBM with conspiring with others, including U.S. taxpayers, in violation of Title 18, United States Code, Section 371, (1) to defraud the United States and an agency thereof, to wit, the United States Internal Revenue Service (the "IRS"); (2) to file false federal income tax returns in violation of Title 26, United States Code, Section 7206(1); and (3) to evade federal income taxes in violation of Title 26, United States Code, Section 7201, for the period from 2002 to 2014.  A copy of the Information is attached hereto as Exhibit B.

## ACCEPTANCE OF RESPONSIBILITY

2.      BHBM admits and stipulates that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate.  In sum, BHBM admits that it is responsible under U.S. law for the federal criminal violations charged in the Information and set forth in the Statement of Facts as a result of the acts of its officers, directors, employees and agents.

## STATEMENT REGARDING THE BANK'S PAST COOPERATION

3.      In 2011, the Department requested certain statistical data from BHBM's wholly owned Swiss subsidiary Hapoalim (Switzerland) Ltd. ("BHS") through the Swiss authorities, and advised that the Department had commenced a criminal investigation of the Bank for assisting U.S. taxpayers in evading income taxes.  The Bank, which believed the focus of the investigation was on BHS, responded to the requests for statistical data regarding BHS, but the Bank did not conduct an internal investigation of its U.S. accounts at that time.

4.      The Department continued to pursue its investigation of the Bank.  When the Department reinitiated contact with the Bank's U.S. outside counsel, and after the Department resolved a criminal investigation of another Israeli bank, the Bank began to cooperate with the Department's investigation in late 2014.  However, the Bank's initial cooperation was deficient, marked by an inadequate internal investigation, the failure to timely disclose relevant facts, and the provision of incomplete and, in certain cases, inaccurate information and data to the Department.  For example, the Department uncovered evidence of the criminal misconduct of a BHS senior executive and board member in July 2016 through its own investigation, with no assistance from the Bank.  In addition, the Bank provided unreliable data to the Department regarding, among other things, the identification of U.S. related accounts at BHS, and did not engage an external accounting firm for the purpose of assisting in providing data to the Department until May 2017.  Thereafter, the Department required the appointment of an independent examiner, whose work began in early 2017.  As a result of the Bank's delayed cooperation, the Department's efforts to timely resolve the investigation of the Bank were hindered, and the Department's efforts to prosecute certain potentially culpable individuals were thwarted.  For example, as a result of delays in its internal investigation, the Bank did not interview a potentially culpable individual prior to his departure from BHS, and the Bank did not have access to him after his departure.  In addition, the Bank failed to take adequate steps to preserve email, in that the Bank did not retain all available email records, and certain relevant email boxes were deleted up through mid-2016 and certain relevant back-up tapes were deleted up through mid-2018.  Upon learning of the deletions, which do not appear to have been intended to interfere with the investigation, the Bank took all reasonable steps to recover all available emails and other data.

5.      In 2017, the Bank enhanced its efforts in order to cooperate fully with the Department's investigation. The Bank replaced its lead outside counsel, accepted responsibility, and took the following steps, among others, as part of its cooperation: conducted an extensive internal investigation, including the review of more than 2,000,000 documents from over 300 custodians in a variety of countries; made regular presentations to the Department on a wide variety of factual topics, including the provision of relevant facts about individual wrongdoers; produced over 1,000,000 pages of documents, including producing documents from foreign countries in

ways that did not implicate foreign data privacy laws and producing translations of foreign language documents; collected, analyzed and organized voluminous new evidence and information for the Department; interviewed, and/or facilitated the Department's interviews of, numerous current and former Bank employees and former members of BHS's Board of Directors; assisted the Department with requests under the Tax Treaty and various Mutual Legal Assistance Treaties; and litigated and appealed in various courts in an attempt to obtain permission to disclose certain employee identities and documents for production to the Department.  Ultimately, the Bank provided the Department with substantial information concerning the topics at issue in the investigation, including relevant facts related to the conduct described in the Statement of Facts.

## RESTITUTION, FORFEITURE AND PENALTY OBLIGATIONS

6.      As a result of the conduct described in the Information and the Statement of Facts, BHBM agrees to make payments in total of $214,385,612 to the United States.  Specifically, BHBM agrees to (1) make a payment of restitution in the amount of $77,877,099 (the "Restitution Amount"); (2) forfeit $35,696,929 (the "Forfeiture Amount") to the United States; and (3) pay a penalty of $100,811,584 (the "Penalty Amount") to the Department, as set forth below.

### Restitution

7.      In regard to the Restitution Amount, BHBM admits and the Department agrees that the Restitution Amount represents the approximate gross pecuniary loss to the Internal Revenue Service as a result of the conduct described in the Statement of Facts.  The Restitution Amount shall not be further reduced by payments made to the Internal Revenue Service by U.S. taxpayers through the Offshore Voluntary Disclosure Initiative and similar programs (collectively, "OVDI") before or after the date of this Agreement that have not already been credited against the Restitution Amount.  BHBM agrees to pay the Restitution Amount to the IRS by wire transfer within seven (7) days of the date of the Court's approval of deferral under the Speedy Trial Act in connection with this Agreement.  If BHBM fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Department, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 25 and 26, below.

### Forfeiture

8.      The Forfeiture Amount of $35,696,929 represents a substitute *res* for the approximate gross fees paid to BHBM by U.S. taxpayers with undeclared accounts at BHBM from 2002 through 2014 and BHBM agrees that it is subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

9.      The Forfeiture Amount shall be sent by wire transfer to a seized asset deposit account maintained by the United States Department of the Treasury within seven (7) days of the Court's approval of deferral under the Speedy Trial Act in connection with this Agreement.  If BHBM fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Department, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 25 and 26, below.

10. Upon payment of the Forfeiture Amount, BHBM shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds.

11. BHBM agrees this Agreement, the Information, and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint"), a copy of which is attached hereto as Exhibit D, that will be filed against the Forfeiture Amount. By this Agreement, BHBM expressly waives service of that Civil Forfeiture Complaint and agrees that a Judgment of Forfeiture may be entered against the Forfeiture Amount. BHBM also agrees that the facts contained in the Information and Statement of Facts are sufficient to establish that the Forfeiture Amount is subject to civil forfeiture to the United States.

## **Penalty**

12. The Department and BHBM agree that, consistent with the factors set forth in U.S.S.G. § 8C2.8 and 18 U.S.C. §§ 3553(a) and 3572(a), and in light of the Forfeiture Amount and the Restitution Amount, the Penalty Amount of $100,811,584 is an appropriate penalty in this case. This amount reflects a total deduction of $51,572,500 in partial credit for payments made to the Board of Governors of the Federal Reserve System and the New York Department of Financial Services related to the conduct described herein, and a 25% discount for cooperation. BHBM agrees to pay the Penalty Amount as directed by the Department within seven (7) days of the Court's approval of deferral under the Speedy Trial Act in connection with this Agreement. The Department and BHBM agree that the Penalty Amount is appropriate given the facts and circumstances of this case, including the nature and seriousness of BHBM's conduct as set forth in the Statement of Facts, and also, in mitigation of a higher penalty, among other things, the extensive investigation conducted by BHBM, and the provision of a substantial amount of documents to the Department and the facilitation of witness interviews by BHBM. The Department and BHBM further agree that the Penalty Amount is final and shall not be refunded, that nothing in this Agreement shall be deemed an agreement by the Department that the Penalty Amount is the maximum penalty that may be imposed in any future prosecution, and that the Department is not precluded from arguing in any future prosecution that the Court should impose a higher penalty.

13. BHBM agrees that it will not file a claim or a petition for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeiture Amount or the payment of the Penalty Amount described above, or any other action or motion seeking to collaterally attack the seizure, restraint, forfeiture, or conveyance of the Forfeiture Amount or the Penalty Amount, nor shall it assist any others in filing any such claims, petitions, actions, or motions.

## **Non-Deductibility**

14. BHBM agrees that the Restitution Amount, the Forfeiture Amount, and the Penalty Amount shall be treated as non-tax-deductible amounts paid to the United States Government for all tax purposes under United States law. BHBM agrees that it will not claim, assert, or apply for,

either directly or indirectly, a tax deduction, tax credit, or any other offset with regard to any United States federal, state, or local tax, for any portion of the $214,385,612 that BHBM has agreed to pay to the United States pursuant to this Agreement.

## TERM OF THE AGREEMENT

15.     BHBM agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date of the Court's acceptance of this Agreement, unless otherwise extended pursuant to Paragraph 16 below (the "Deferral Period").  BHBM's obligation to cooperate is not intended to apply in the event that a prosecution against BHBM by the Department is pursued and not deferred.

16.     BHBM agrees that, in the event that the Department determines during the Deferral Period described in Paragraph 15 above (or any extensions thereof) that BHBM has violated any provision of this Agreement, an extension of the period of the Deferral Period may be imposed in the sole discretion of the Department, up to an additional one year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four years.

## DEFERRAL OF PROSECUTION

17.     BHBM has made a commitment to:  (a) accept and acknowledge responsibility for its conduct, as described in the Statement of Facts and the Information attached hereto; (b) cooperate fully with the Department, the IRS, and any other law enforcement agency so designated by the Department; (c) make the payments specified in this Agreement; (d) comply with the federal criminal laws of the United States (as provided herein in Paragraph 19(e)); and (e) otherwise comply with all of the terms of this Agreement.  In consideration of the foregoing, the Department shall recommend to the Court that prosecution of BHBM on the Information be deferred for three years.  BHBM shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.

18.     The Department agrees that if BHBM is in compliance with all of its obligations under this Agreement, the Department will, at the expiration of the Deferral Period (including any extensions thereof), seek dismissal with prejudice of the Information filed against BHBM pursuant to this Agreement.  Except in the event of a violation by BHBM of any term of this Agreement or as otherwise provided in Paragraph 25, the Department will bring no additional charges or other civil action against BHBM relating to its conduct as described in the Information and the Statement of Facts attached hereto.  This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than BHBM.  BHBM and the Department understand that the Court must approve deferral under the Speedy Trial Act, in accordance with 18 U.S.C. § 3161(h)(2).  Should the Court decline to defer prosecution for any reason:  (a) both the Department and BHBM are released from any obligation imposed upon them by this Agreement; (b) this Agreement shall be null and void, except for the tolling provision set forth in Paragraph 25, below; and (c) if they have already been transferred to

the United States, the Restitution Amount, Forfeiture Amount and Penalty Amount shall be returned to BHBM.

## CONTINUING COOPERATION

19.     During the Deferral Period, BHBM shall cooperate fully, subject to applicable laws and regulations, with the Department, the IRS, and any other federal law enforcement agency designated by the Department regarding all matters related to the Department's investigation into U.S.-related accounts banking at BHBM (the "Department's Investigation") about which BHBM has information or knowledge, including:

(a)     truthfully and completely disclose all information with respect to the activities of BHBM, its subsidiaries, officers, and employees, and others concerning all such matters about which the Department inquires related to the Department's Investigation, which information can be used for any purpose, except as limited by this Agreement or by applicable law;

(b)     specifically provide, upon request, all items, assistance, information and documents required to be produced by Swiss banks participating in the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks (the "Swiss Bank Program") as set forth specifically in Parts II.D.1(a)-(d) and 2 of the Swiss Bank Program;

(c)     expand, as soon as practicable, transaction information previously produced in response to requests based on Part II.D.2.b.vi of the Swiss Bank Program, to include accounts closed in the period from January 1, 2009 through December 31, 2019, in the format requested by the Department;

(d)     make reasonable efforts to implement the closure of recalcitrant accounts and related procedures, to the extent that it has not already done so, as set forth in Part II.G of the Swiss Bank Program and as otherwise consistent with Israeli law;

(e)     truthfully and completely disclose, and continue to disclose during the Deferral Period, consistent with applicable law and regulations, all information described in Part II.D.1 of the Swiss Bank Program with respect to U.S. Related Accounts held by BHBM from 2002 through 2014 (as those terms are defined in the Swiss Bank Program) that is not protected by a valid claim of privilege or work product with respect to the activities of BHBM and its officers, directors, employees, agents, consultants, and others, which information can be used for any purpose, except as otherwise limited in this Agreement.  Subject to applicable laws and regulations, BHBM shall disclose to the Department that it has discovered new information required to be disclosed under this Agreement, including pursuant to this paragraph and Paragraph 19(b) and (c), no later than thirty days from discovery and provide such information, including information as described in Part II.D.1 of the Swiss Bank Program and information pursuant to Paragraph 19(b) and (c) of this Agreement, no later than ninety days from discovery.  All other terms of this Agreement shall apply with respect to any newly disclosed account;

(f)     provide all necessary information and assist the United States with the drafting of treaty requests to seek account records and other information, and will collect and

maintain all records that are potentially responsive to such treaty requests to facilitate prompt responses; and

    (g) BHBM shall commit no violations of the federal criminal laws of the United States.

  20. It is further understood that during the Deferral Period, BHBM will bring, consistent with applicable laws or regulations, to the Department's attention: (a) all criminal conduct by, and criminal investigations of, BHBM or its subsidiaries, officers, and employees related to any violations of the federal laws of the United States that come to the attention of BHBM's board of directors, executive committee, or senior management, and (b) any investigation conducted by, or any civil, administrative, or regulatory proceeding brought by, any U.S. governmental authority that alleges fraud by BHBM or any other violations of the federal laws of the United States in the operation or management of BHBM's business.

  21. With respect to BHI-USA, BHBM agrees to provide the Government with periodic reports identifying how many loans, if any, issued by BHI-USA that are collateralized by offshore BHBM accounts, or accounts of any foreign affiliate of BHBM. The periodic reports shall further affirm that BHI-USA is fully compliant with applicable anti-money laundering regulations regarding such loans and that the relevant foreign affiliate has confirmed that the related foreign account is FATCA-compliant. The periodic reports shall be due on the two-month anniversary of the Court's acceptance of this Agreement, and every one hundred eighty (180) days thereafter until the end at the Deferral Period.

  22. Notwithstanding the Deferral Period, BHBM shall also, subject to applicable laws or regulations, continue to cooperate with the Department, the IRS, and any other federal law enforcement agency designated by the Department regarding any and all matters related to the Department's Investigation until the date on which all civil or criminal examinations, investigations, or proceedings, including all appeals, are concluded, whether those examinations, investigations, or proceedings are concluded within the Deferral Period, including:

    (a) cooperate fully with the Department, the IRS, and any other federal law enforcement agency designated by the Department regarding all matters related to the Department's Investigation;

    (b) retain all records relating to the Department's Investigation, for a period of ten years from the end of the Deferral Period;

    (c) provide all necessary information and assist the United States with the drafting of treaty requests seeking account information for accounts owned and/or controlled by U.S. persons, and collect and maintain all records that are potentially responsive to such treaty requests in order to facilitate a prompt response;

    (d) assist the Department or any designated federal law enforcement agency in any investigation, prosecution, or civil proceeding arising out of or related to the Department's

Investigation by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding;

(e)     use its best efforts promptly to secure the attendance and truthful statements or testimony or information of any current or former officer, director, employee, agent, or consultant of BHBM or its subsidiaries at any meeting or interview or before any grand jury or at any trial or other court proceeding regarding matters arising out of or related to the Department's Investigation;

(f)     provide testimony of a competent witness as needed to enable the Department and any designated federal law enforcement agency to use the information and evidence obtained pursuant to BHBM's cooperation with the Department before a grand jury or at any trial or other court proceeding regarding matters arising out of or related to the Department's Investigation;

(g)     provide the Department, upon request, consistent with applicable law and regulations, all information, documents, records, or other tangible evidence not protected by a valid claim of privilege or work product regarding matters arising out of or related to the Department's Investigation about which the Department or any designated federal law enforcement agency inquires;

(h)     upon request, provide fair and accurate translations, at BHBM's expense, of any foreign language documents produced by BHBM to the Government either directly or through any government entity; and

(i)     provide to any state law enforcement agency such assistance as may reasonably be requested in order to establish the basis for admission into evidence of documents already in the possession of such state law enforcement agency in connection with any state civil or criminal tax proceedings brought by such state law enforcement agency against an individual arising out of or related to the Department's Investigation.

23.     BHBM agrees to use best efforts to close, as soon as practicable, and in no event later than the end of the Deferral Period, as otherwise consistent with Israeli law, any and all U.S. Penalty Accounts (as that term is defined in the Statement of Facts attached hereto as Exhibit C) that have been classified as "dormant" in accordance with applicable laws, regulations and guidelines, and will provide periodic reporting upon request of the Department if unable to close any dormant accounts within that time period.  BHBM will only provide banking or securities services in connection with any such dormant account to the extent that such services are required pursuant to applicable laws, regulations and guidelines.  If at any point contact with the account holder(s) (or other persons(s) with authority over the account) is re-established, BHBM will promptly proceed to follow the procedures described above in Paragraph 19(d).

24.     Nothing in this Agreement shall require BHBM to waive any protections of the attorney-client privilege, attorney work-product doctrine, or any other applicable privilege unless BHBM voluntarily chooses to waive any such privilege.  Nothing in this Agreement shall require BHBM to violate the law of any jurisdiction in which it operates.

## BREACH OF THE AGREEMENT

25.     It is understood that should the Department in its sole discretion determine during the Deferral Period that BHBM:  (a) has knowingly given materially false, incomplete or misleading information either during the Deferral Period or in connection with the Department's Investigation of the conduct described in the Information or Statement of Facts; (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement; or (c) otherwise knowingly violated any provision of this Agreement, BHBM shall, in the Department's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, including but not limited to a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice.  Any such prosecution or civil action may be premised on any information provided by or on behalf of BHBM to the Department or the IRS at any time.  In any prosecution or civil action based on the Information, the Statement of Facts, or the conduct described therein, it is understood that: (a) no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period (subject to any prior tolling agreements between the Department and BHBM), and excluding the period from the execution of this Agreement until its termination; and (b) BHBM agrees to toll, and exclude from any calculation of time, the running of the statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to Paragraph 16 above.  By this Agreement, BHBM expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay.  Such waivers are knowing, voluntary, and in express reliance on the advice of BHBM's counsel.

26.     It is further agreed that in the event that the Department, in its sole discretion, determines that BHBM has knowingly violated any provision of this Agreement, including by failure to meet its obligations under this Agreement:  (a) all statements made by or on behalf of BHBM to the Department, or the IRS, including but not limited to the Statement of Facts, or any testimony given by BHBM or by any agent of BHBM before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Department against BHBM; and (b) BHBM shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of BHBM before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence.  It is the intent of this Agreement to waive any and all rights in the foregoing respects.

27.     BHBM, having admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any public statement, in litigation or otherwise, contradicting the Statement of Facts or its representations, agreements and stipulations in this Agreement or in the plea agreement between the Department and BHS.  Any such contradictory statement by BHBM, through its present or future attorneys, partners, agents, or employees authorized to speak on behalf of the Bank, shall constitute a violation of this

Agreement, and BHBM thereafter shall be subject to prosecution as specified in Paragraphs 25 and 26, above, or the Deferral Period shall be extended pursuant to Paragraph 16, above. The decision as to whether any such contradictory statement will be imputed to BHBM for the purpose of determining whether BHBM has violated this Agreement shall be within the sole discretion of the Department. Upon the Department's notifying BHBM of any such contradictory statement BHBM may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Department within 48 hours after having been provided notice by the Department. BHBM consents to the public release by the Department, in its sole discretion, of any such repudiation. The Department agrees that nothing in this Agreement in any way prevents BHBM from taking good faith positions, raising defenses, or asserting affirmative claims that are not inconsistent with the Statement of Facts in any civil proceedings, investigations, or litigation involving private parties or government entities, including non-U.S. litigations or non-U.S. investigations. Nothing in this Agreement is meant to affect the obligation of BHBM or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

28.     BHBM agrees that it is within the Department's sole discretion to choose, in the event of a violation, the remedies contained in Paragraphs 25 and 26 above, or instead to choose to extend the period of deferral of prosecution pursuant to Paragraph 16. BHBM understands and agrees that the exercise of the Department's discretion under this Agreement is unreviewable by any court. Should the Department determine that BHBM has violated this Agreement, the Department shall provide prompt written notice to BHBM of that determination and provide BHBM with a 30-day period from the date of receipt of notice in which to make a presentation to the Department to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by BHBM.

## ADDITIONAL PROVISIONS

### Limits of the Agreement

29.     It is understood that this Agreement is binding on the Office and the Tax Division, but does not bind any other components of the Department of Justice, any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities. However, if requested by BHBM or its attorneys, the Department will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the cooperation of BHBM, and BHBM's compliance with its obligations under this Agreement.

### Public Filing

30.     The Department and BHBM agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

Page 11

31.     The parties understand that this Agreement reflects the special facts of this case and is not intended as precedent for other cases.

## Execution in Counterparts

32.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Page 12

## Integration Clause

33.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between BHBM and the Department. This Agreement supersedes all prior understandings or promises between the Department and BHBM. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, the Tax Division, BHBM's attorneys, and a duly authorized representative of BHBM.

Dated: New York, New York
April 22, 2020

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By:

Sagar K. Ravi
Timothy V. Capozzi
Assistant United States Attorneys
(212) 637-2195 /2404

APPROVED:

Laura Grossfield Birger
Chief, Criminal Division

RICHARD E. ZUCKERMAN
Principal Deputy Assistant
Attorney General

By:

Todd A. Ellinwood, Assistant Section Chief
Nanette L. Davis, Senior Litigation Counsel
(202) 616-9330/514-8030

Page 13

ACCEPTED AND AGREED TO:

_____          _____
Dov Kotler                         Date
Chief Executive Officer
Bank Hapoalim B.M.


_____          _____
Yael Almog                         Date
Chief Legal Advisor
Bank Hapoalim B.M.


_____          _____
David Braff, Esq.                  Date
Aisling O'Shea, Esq.


_____          _____
Avi Gesser, Esq.                   Date
Attorneys for Bank Hapoalim B.M.

Pursuant to 18 U.S.C. §3161(h)(2), exclusion under the Speedy Trial Act of the period of time

during which the prosecution of the defendant Bank Hapoalim B.M. is deferred pursuant to this

Deferred Prosecution Agreement is hereby approved.


Dated: New York, New York
April ____, 2020

**SO ORDERED:**


_____
HONORABLE MARY KAY VYSKOCIL
United States District Judge
Southern District of New York

**Exhibit A to Deferred Prosecution Agreement with Bank Hapoalim B.M.**

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, Bank Hapoalim B.M. ("BHBM") has been engaged in discussions with the United States Attorney's Office for the Southern District of New York and the Tax Division of the United States Department of Justice (collectively the "Department") regarding certain issues arising out of, in connection with, or otherwise relating to the conduct of BHBM's cross-border banking business with U.S. customers; and

WHEREAS, in order to resolve such discussions, it is proposed that BHBM enter into a deferred prosecution agreement (the "Agreement") with the Department; and

WHEREAS, outside counsel for BHBM has advised the Board of Directors of BHBM of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into the Agreement with the Department; and

Therefore, after closely reviewing the Agreement and the accompanying documents, including the Information and the Statement of Facts, at a duly held meeting on April 22, 2020, the Board of Directors has unanimously RESOLVED that:

1.      BHBM: (a) consents to the filing of a one-count Information in the United States District Court for the Southern District of New York charging BHBM and its subsidiary, Hapoalim (Switzerland) Ltd. with conspiring with others, including U.S. taxpayers, in violation of Title 18, United States Code, Section 371, to (i) defraud the United States and an agency thereof, to wit, the United States Internal Revenue Service; (ii) file false federal income tax returns in violation of Title 26, United States Code, Section 7206(1); and (iii) evade federal income taxes in violation of Title 26, United States Code, Section 7201; (b) waives indictment on such charges; (c) waives its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title

18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (d) agrees to pay a total of $214,385,612 to the United States Treasury, which includes a monetary penalty of $100,811,584, forfeited funds of $35,696,929, and restitution in the amount of $77,877,099;

2.      The Board of Directors has unanimously voted to enter into the Agreement and accepts its terms and conditions;

3.      The Chief Executive Officer of BHBM, Dov Kotler, and Chief Legal Advisor of BHBM, Yael Almog, are hereby jointly authorized, empowered, and directed, on behalf of BHBM, to execute the Agreement substantially in such form as reviewed by this Board of Directors, with such minor changes as either the Chief Executive Officer of BHBM, Dov Kotler, or Chief Legal Advisor of BHBM, Yael Almog, may approve;

4.      The Chief Executive Officer of BHBM, Dov Kotler; Chief Legal Advisor of BHBM, Yael Almog; and BHBM's outside counsel, David H. Braff and Aisling O'Shea of Sullivan & Cromwell LLP and Avi Gesser of Debevoise and Plimpton LLP, are hereby each individually authorized and empowered to act and speak on behalf of BHBM in any proceeding or as otherwise necessary for the purpose of executing the Agreement;

5.      The Chief Executive Officer of BHBM, Dov Kotler; Chief Legal Advisor of BHBM, Yael Almog; and BHBM's outside counsel, David H. Braff and Aisling O'Shea of Sullivan & Cromwell LLP and Avi Gesser of Debevoise and Plimpton LLP, are hereby each individually authorized, empowered, and directed to take any and all actions as may be necessary or appropriate to approve the forms, terms, or provisions of any agreement or other documents as

may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

6.      All actions of the Chief Executive Officer of BHBM, Dov Kotler, and Chief Legal Advisor of BHBM, Yael Almog, which would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of BHBM.


Date: April 12, 2020          By:    O. Eran

Oded Eran
Chairman of the Board of Directors
Bank Hapoalim B.M.

**Exhibit B to Deferred Prosecution Agreement with Bank Hapoalim B.M.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :
                              <u>INFORMATION</u>

   -v-                          :

                              20 Cr.

BANK HAPOALIM B.M., and         :
HAPOALIM (SWITZERLAND) LTD.,
                             :

               Defendants.

- - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Defraud the United States)

     The United States Attorney charges:

### Bank Hapoalim B.M.

     1.   Bank Hapoalim B.M. ("BHBM"), the defendant, is an Israeli public company that is one of Israel's largest banks. Founded in 1921, BHBM operates primarily as a retail bank with approximately 250 branches throughout Israel and more than two-and-a-half million accounts. In addition to domestic retail banking services, BHBM offered private banking services for onshore and offshore customers through its retail branches and through its Global Private Banking Center at its Hayarkon branch.  Since 1950, BHBM has also had a wholly owned subsidiary in Israel, Poalim Trust Services Ltd. (known as "Pashan"), which provides trust formation and management services.

     2.   At all times relevant to this Information, BHBM, the defendant, provided private banking, asset management, and

1

other services to individuals and entities around the world,
including U.S. taxpayers in the Southern District of New York.
BHBM operates BHI-USA, a commercial bank located in the Southern
District of New York, with branches in Miami, Florida, and
elsewhere.

### Hapoalim (Switzerland) Ltd.

3.    Hapoalim (Switzerland) Ltd. (formerly Bank
Hapoalim (Switzerland) Ltd.), the defendant ("BHS," together
with BHBM, the "Bank"), was a Swiss bank and is a wholly owned
subsidiary of BHBM.  Established in 1975, BHS has a branch in
Luxembourg ("BHS-Luxembourg").  From 2007 through May 2013, BHS
also had a branch in Singapore ("BHS-Singapore").  At times
between 2000 through 2014, BHS also had representative offices
in Israel, Hong Kong, Mexico, and Moscow.  Prior to November
2010, BHS also maintained a subsidiary, Hapoalim Fiduciary
Services Limited ("Hapoalim Fiduciary"), formerly known as
Hapoalim Trustees Limited, which was based in the Bailiwick of
Jersey and provided trust services to BHS clients.

### Obligations of United States Taxpayers
### With Respect to Foreign Financial Accounts

4.    At all times relevant to this Information, U.S.
citizens and residents who had income in any one calendar year
in excess of a threshold amount ("U.S. taxpayers") were required
to file a U.S. Individual Income Tax Return, Form 1040 ("tax

return"), for that calendar year with the Internal Revenue
Service ("IRS") by April 15 of the following year.  On that tax
return, U.S. taxpayers were obligated to report their worldwide
income, including all income earned from foreign bank accounts,
and to pay the taxes due on that income.

5.   U.S. taxpayers also had an obligation to report
to the IRS on the Schedule B of a tax return whether they had a
financial interest in, or signature authority over, a financial
account in a foreign country in a particular year by checking
"Yes" or "No" in the appropriate box and identifying the country
where the account was maintained.

6.   In addition, U.S. taxpayers who had a financial
interest in, or signature authority over, one or more financial
accounts in a foreign country with an aggregate value of more
than $10,000 at any time during a particular year were required
to file with the Department of the Treasury a Report of Foreign
Bank and Financial Accounts, FinCEN Form 114 (the "FBAR,"
formerly known as Form TD F 90-22.1).  The FBAR had to be filed
on or before June 30 of the following year for calendar years up
to and including 2015.  From 2016 forward, the FBAR filing date
coincided with the tax return due date, generally April 15.

7.   The regulations relating to the required disclosure
of foreign bank accounts specifically precluded U.S. taxpayers
from having foreign accounts nominally held by sham corporate

3

structures as a means of avoiding disclosure.  Specifically, as set forth in Title 31, Code of Federal Regulations, Section 1010.350(e)(3):

> A United States person that causes an entity, including but not limited to a corporation, partnership, or trust, to be created for a purpose of evading this section [requiring generally the disclosure of offshore financial accounts containing over $10,000 and over which a U.S. taxpayer has signature or other authority] shall have a financial interest in any bank, securities, or other financial account in a foreign country for which the entity is the owner of record or holder of legal title.

8.  An "undeclared account" refers to a financial account owned or beneficially owned by a U.S. taxpayer and maintained in a foreign country that had not been reported by the individual account owner or beneficial owner to the U.S. government on a tax return or FBAR.

## Overview of the Conspiracy

9.  From at least in or about January 2002 through in or about December 2014 (the "Relevant Period"), BHBM and BHS, the defendants, unlawfully, voluntarily, intentionally, and knowingly conspired and agreed with U.S. taxpayers (hereinafter, "U.S. taxpayer-clients"), certain Bank senior executives and relationship managers, and wholly owned and third-party fiduciaries and fiduciary service providers, to conceal from the IRS the existence of undeclared accounts maintained at the Bank

4

and the income earned in such accounts, and to evade U.S. taxes due on the income generated in the undeclared accounts.

## Means and Methods of the Conspiracy

10.   BHBM and BHS, the defendants, and their co-conspirators, carried out the conspiracy through, among others, the following means and methods:

a.   Bank relationship managers and BHS senior executives opened and managed undeclared bank and securities accounts at the Bank for U.S. taxpayer-clients that were not reported to the IRS on Forms 1040, FBARs, or otherwise, and the income from which was also not reported to the IRS.

b.   Bank relationship managers and BHS senior executives opened undeclared accounts for U.S. taxpayer-clients using code names or numbers, which helped U.S. clients to eliminate the paper trail associated with the undeclared assets and income they held at the Bank.

c.   Bank relationship managers and BHS senior executives assisted U.S. taxpayer-clients in placing assets in undeclared accounts held in the name of foreign relatives or friends in order to conceal the U.S. taxpayer-clients' beneficial ownership of such assets.

d.   The Bank opened and maintained undeclared accounts in the name of sham corporate entities in order to conceal the U.S. taxpayer-clients' ownership of such assets.

e.    The Bank referred U.S. taxpayer-clients to third-party law firms and its subsidiaries, Hapoalim Fiduciary and Pashan, for the purpose of establishing offshore corporations and trusts, respectively, which facilitated U.S. taxpayer-clients in opening and maintaining undeclared accounts at the Bank in the names of these offshore entities.

f.    BHS acted as "client of record" for U.S. taxpayer-clients who engaged a Panamanian law firm for offshore incorporation services, which allowed the Bank to serve as an intermediary between the law firm and the U.S. taxpayer-clients.

g.    Bank relationship managers ensured that account statements and other records relating to undeclared accounts held at the Bank by U.S. taxpayer-clients were not sent to these clients in the United States.

h.    BHS relationship managers caused U.S. taxpayer-clients with undeclared accounts to travel from the United States to Switzerland in order to discuss their undeclared accounts.

i.    Bank relationship managers and a BHS senior executive traveled to the Southern District of New York and elsewhere in the United States in order to meet with U.S. taxpayer-clients about their undeclared accounts at the Bank.

j.    Bank relationship managers, a BHS board member, and a BHS senior executive assisted in the opening and

6

closure of accounts or transfers of funds in ways designed to maintain the veil of banking secrecy over the U.S. taxpayer-clients' undeclared accounts, such as causing checks to be written to nominees rather than the U.S. taxpayer-client directly, and transfers of cash to and through intermediaries.

k.   Various U.S. taxpayer-clients of the Bank, including U.S. taxpayer-clients in the Southern District of New York, filed false Forms 1040 that failed to report their interest in, and income earned on, their undeclared accounts at the Bank; evaded income taxes due and owing; and failed to file FBARs identifying their undeclared accounts.

### Statutory Allegations

11.   From at least in or about January 2002 through in or about December 2014, in the Southern District of New York and elsewhere, BHBM and BHS, the defendants, together with others known and unknown, willfully and knowingly did conspire, combine, confederate, and agree together and with each other to defraud the United States of America and an agency thereof, to wit, the IRS, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7206(1) and 7201.

12.   It was a part and object of the conspiracy that BHBM and BHS, the defendants, together with others known and unknown, willfully and knowingly would and did defraud the

United States of America and the IRS by impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

13.  It was further a part and an object of the conspiracy that various U.S. taxpayer-clients of BHBM and BHS, the defendants, together with others known and unknown, willfully and knowingly would and did make and subscribe income tax returns, statements, and other documents, which contained and were verified by written declarations that they were made under the penalties of perjury, and which these U.S. taxpayer-clients, together with others known and unknown, did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

14.  It was further a part and an object of the conspiracy that BHBM and BHS, the defendants, together with others known and unknown, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the United States of America by certain of the Bank's U.S. taxpayer-clients, in violation of Title 26, United States Code, Section 7201.

**Overt Acts**

15.  In furtherance of the conspiracy and to effect the illegal objects thereof, BHBM and BHS, the defendants, and others

8

known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about June 14, 2006, BHBM's Global Private Banking Center in Israel faxed a Pledge Confirmation to its branch in New York, confirming that $24 million in a U.S. taxpayer-client's BHBM-Israel account, which was undeclared, was pledged as collateral for a loan to the U.S. taxpayer-client ("Client-1") in the United States.

b.   On or about July 19, 2007, Masud Sarshar, a BHBM U.S. taxpayer-client, received into his undeclared account at BHBM approximately $687,118.88 in income from his business. Masud Sarshar omitted this income from his total income when he filed his 2007 Form 1040.

c.   From on or about March 23, 2008 through April 6, 2008, a BHBM relationship manager ("BHBM RM-1") traveled to New York and Los Angeles to service existing U.S. taxpayer-clients, some of whom had undeclared accounts at BHBM, and to recruit new U.S. clients for BHBM.

d.   On or about September 3, 2008, Masud Sarshar filed a false and fraudulent Form 1040 for tax year 2007 with the IRS, on which he omitted approximately $513,003 in interest income from BHBM.

e.   On or about December 31, 2008, a U.S. taxpayer-client ("Client-2") faxed a signed promissory note to

BHBM's Miami branch in support of the renewal of a $7.8 million back-to-back loan that was secured by Client-2's undeclared BHS account.

       f.   In or about March 2009, a U.S. taxpayer-client ("Client-3"), with the assistance of a BHS senior executive ("Senior Executive-1"), opened an account at BHS-Singapore in the name of an offshore corporation.  Senior Executive-1 appointed himself as the sole director of the corporation and was the sole signatory on the account.  Client-3 further funded the account with undeclared funds from Client-3's account at Union Bank Privée in Switzerland.

       g.   On or about April 28, 2009, a U.S. taxpayer-client ("Client-4") signed and submitted a letter to a BHS senior executive ("Senior Executive-2"), who later became a board member, instructing Senior Executive-2 to issue ten checks totaling $88,000, all in amounts less than $10,000 during the period of April and May 2009, to the order of a Swiss lawyer ("Swiss Lawyer-1") known to both Client-4 and Senior Executive-2.  The checks were to be debited from Client-4's undeclared account at BHS held in the name of Client-4's Israeli friend.

       h.   On or about May 4, 2009, following Client-4's instructions, BHS Senior Executive-2 caused BHS to issue a bank check and mail it to Client-4 via priority mail.  The envelope was sent to a postal box held by a corporation owned by

Client-4's friend in Miami, Florida, and contained a blank greeting card enclosing the BHS check made payable to Swiss Lawyer-1.

        i.   In or about May 2009, BHS opened an account for a U.S. taxpayer-client friend ("Client-5") of a BHS senior executive ("Senior Executive-3"), whose account opening paperwork was completed during a meeting between Client-5 and Senior Executive-3 in New York, New York, but without the required Form W-9.  The account opening was approved by BHS's compliance department, and the account was funded with a $300,000 transfer from Clariden Leu, another Swiss bank.

        j.   On or about September 14, 2009, BHBM processed "irregular withdrawals" of funds for certain U.S. taxpayer-clients of BHBM RM-1 whom he described to his manager as fearful that "Israeli banks will follow the Swiss UBS and expose to the American Authorities the names of American customers who hold accounts in Israel," including: (a) a U.S. taxpayer-client ("Client-6") who transferred $1.8 million to his U.K. citizen/resident brother's account at BHBM in which the transfer was described as a loan; and (b) a U.S. taxpayer-client ("Client-7") who transferred his $3.5 million BHBM account balance to a lawyer's trust account.

        k.   On or about November 25, 2009, a BHBM manager ("Senior Manager-1") emailed a BHBM employee to say

11

that, although new guidelines for opening new accounts for Americans were forthcoming, if an existing U.S. client initiated contact, it was "business as usual."

l.   On or about April 26, 2010, a BHS senior manager ("Senior Manager-2") forwarded an email to the son of a BHS U.S. taxpayer-client ("Client-8") that summarized proposed changes to the structure of Client-8's undeclared U.S. account. The original email, sent by an employee at Hapoalim Fiduciary to Senior Manager-2 and copying Senior Executive-3, proposed creating a new British Virgin Islands ("BVI") company to be owned by the existing trust and transferring accounts into the name of the new BVI company.

m.   On or about December 22, 2010, BHBM opened an undeclared account for a U.S. taxpayer-client ("Client-9"), which was funded by transfers from a Swiss bank he was being forced to leave.  Client-9's BHBM relationship manager told him not to worry, advising that, in the view of the relationship manager, the United States was not after Israeli banks, only Swiss banks, and that his money would be safe at BHBM.

n.   On or about March 1, 2011, Senior Executive-2 facilitated BHS issuing BHI check number 205266 for $8,950 payable to Swiss Lawyer-1 for the benefit of Client-4.

o.   On or about December 5, 2011, Client-4's Liechtenstein foundation mailed BHS a letter, asking BHS to

12

distribute $200,000 in cash to Client-4 for the purpose of living expenses.  With the assistance of Senior Executive-2, BHS provided the cash to Client-4 during Client-4's visit to BHS on or about that same date.

p.    On or about May 21, 2012, BHS closed the account of Client-5 by providing the client with the equivalent of $25,000 in cash from Client-5's account and transferring the remaining approximate $140,000 as follows: (1) 79,150 Swiss francs to a Swiss jewelry store, and (2) more than 62,000 euros to a Swiss rug merchant.

q.    On or about November 2, 2012, a BHBM compliance officer approved the transfer to an Israeli insurance policy account of $3.96 million in an account in the name of a Panamanian corporation with a U.S. taxpayer-client beneficial owner ("Client-10") who refused to sign a Form W-9.  Consistent with BHBM's transfer policies, the wire transfer named the beneficiary and designated the transfer as relating to a U.S. person.

r.    On or about March 5, 2013, a BHS employee created false know-your-customer documents with respect to Client-6's BHS account, in order to conceal Client-6's ownership of the account as a U.S. person.  The documentation falsely

portrayed the source of funds as deriving from Client-6's

deceased non-U.S. father's alleged real estate investments.

(Title 18, United States Code, Section 371.)


GEOFFREY S. BERMAN
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

v.

### BANK HAPOALIM B.M.,
### HAPOALIM (Switzerland) Ltd.,

Defendants.

---

### <ins>INFORMATION</ins>

### 20 Cr.

### (18 U.S.C. § 371)

---

GEOFFREY S. BERMAN
United States Attorney.

---

**Exhibit C to Deferred Prosecution Agreement with Bank Hapoalim B.M.**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement between the United States Attorney's Office for the Southern District of New York ("USAO"), the Tax Division of the Department of Justice (with the USAO, the "Department"), and Bank Hapoalim B.M.  As used herein, and unless otherwise specified, the "Bank" and the "Bank Hapoalim Group" refer collectively to Bank Hapoalim B.M., its subsidiaries, branches, representative offices, and predecessors in interest.  The parties agree and stipulate that the following is true and accurate:

## I.   OVERVIEW

Bank Hapoalim B.M. ("BHBM") is a public company, registered with the Registrar of Companies in Israel and traded on the Tel Aviv Stock Exchange.  BHBM is one of Israel's largest banks and is regulated by the Bank of Israel.  Founded in 1921, BHBM operates primarily as a retail bank with approximately 250 branches throughout Israel and more than two and a half million accounts.  The conduct discussed in this Statement of Facts occurred from 2002 through 2014 (hereinafter, the "Relevant Period").  As of December 31, 2014, the Bank Hapoalim Group had approximately $235 billion in assets under management ("AUM") and approximately 12,600 employees.  In addition to domestic retail banking services, during the Relevant Period, BHBM offered private banking services for onshore and offshore customers through its retail branches and through its Global Private Banking Center ("GPBC") at its Hayarkon branch.  Since 1950, BHBM has also had a wholly owned subsidiary in Israel, Poalim Trust Services Ltd. (known as "Pashan"), which provides trust formation and management services.

BHBM operates primarily in Israel, but it also has or had several branches and subsidiaries in other countries.  BHBM's main operations outside of Israel during the Relevant Period included:

- Its principal, wholly owned subsidiary in Switzerland, known as Bank Hapoalim Switzerland ("BHS"), now known as Hapoalim (Switzerland) Ltd.  Established in 1975, BHS primarily provided private banking services.  BHS is headquartered in Zurich and has a branch in Luxembourg ("BHS-Luxembourg").  BHS-Luxembourg shares its office, electronic systems, and certain employees with Bank Hapoalim (Luxembourg) SA ("BHL"), a wholly owned subsidiary of BHBM operating under the laws of Luxembourg, which primarily offers commercial banking services.  From 1991 to 2017, BHS had a branch in Geneva (together with the Zurich headquarters, "BHS-Switzerland").  From 2007 through May 2013, BHS also had a branch in Singapore ("BHS-Singapore").  At times during 2002 through 2014, BHS also had representative offices in Israel, Hong Kong, Mexico, and Moscow.  Prior to November 2010, BHS also maintained a subsidiary, Hapoalim Fiduciary Services Limited ("Hapoalim Fiduciary"), formerly known as Hapoalim Trustees Limited, which was based in the Bailiwick of Jersey and provided trust services to BHS clients.  In 2017, BHBM announced it was terminating BHS's operations in order to minimize overall compliance

risks.  In November 2018, BHS sold most of its assets and is now in the process of winding down.

- BHBM has three branches in New York, New York, which are engaged primarily in commercial banking, and are regulated by the Federal Deposit Insurance Corporation ("FDIC"), the Federal Reserve Bank of New York, the New York Department of Financial Services, and the Bank of Israel.  Until December 2017, BHBM had a branch in Miami, regulated by the Federal Reserve Bank of Atlanta and the Florida Office of Financial Regulation, which engaged primarily in private banking for Latin American customers.  The Miami branch was closed as part of the Bank's broader exit from the Latin American market.  BHBM also has a representative office in Los Angeles, California (opened in 2014), among other locations (together with the New York branches, the Miami branch, and other U.S. representative offices, "BHI-USA").

- From at least the early 1980s to 2007, BHBM had a branch in George Town, Cayman Islands, and, from at least the late 1980s to 2011 and 2013, respectively, BHBM had branches in Manchester and London, United Kingdom.  From 2008 to 2010, BHBM also maintained a subsidiary in the Bailiwick of Jersey.

Certain senior executives transferred between BHBM and BHS during the Relevant Period.  Typically, the head of the BHBM's International Division also acted as the Chair of the BHS Board of Directors.  Certain of the Chief Executive Officers at BHS came from BHBM. During the Relevant Period, 12 BHBM employees served on the BHS Board of Directors.

BHBM provided private banking and asset management services to U.S. taxpayers and assisted certain of those U.S. taxpayers to evade their U.S. tax obligations, file false federal tax returns with the Internal Revenue Service ("IRS"), and otherwise hide accounts held at BHBM from the IRS.  BHBM assisted such customers in a number of ways, including by opening and maintaining undeclared accounts[1] for U.S. taxpayers.  BHBM provided a variety of offshore private banking services that assisted U.S. clients in the concealment of their assets and income from the IRS.  These services, which are described in further detail below, included, among others, opening and maintaining accounts using code names, numbers, encryption, offshore entities, and trusts; facilitating the creation of offshore entities; issuing loans that provided U.S. taxpayers access to undeclared funds held in offshore accounts while continuing to conceal their assets; opening and maintaining accounts for known U.S. clients using non-U.S. forms of identification; processing wire transfers and issuing checks in amounts of less than $10,000 to avoid scrutiny; and holding all correspondence for some clients at BHBM in order to avoid any correspondence being sent to the United States.  BHBM and certain of its employees, including at least one of its senior executives, knew or should have known that some of their U.S. clients were evading United States taxes.

---

[1] An "undeclared account" was a financial account beneficially owned by an individual subject to U.S. tax obligations and maintained in a foreign country that had not been reported by the individual account owner to the U.S. Government on an income tax return or an FBAR.

In total, during the Relevant Period, BHBM held 3,454 U.S. Penalty Accounts.[2]  Those U.S. Penalty Accounts had an aggregate maximum total of approximately $3.2 billion in assets under management during the Relevant Period, which consisted of approximately 1.4% percent of BHBM's maximum total assets under management.  BHBM earned gross fees of approximately $35.7 million from U.S. Penalty Accounts.

BHBM was responsible under U.S. law for the acts and omissions of its employees as described in this Statement of Facts.

## II.    U.S. INCOME TAX AND REPORTING OBLIGATIONS

U.S. citizens, resident aliens, and legal permanent residents have an obligation to report all income earned from foreign bank accounts on their tax returns and to pay the taxes due on that income.  For the tax year 1976 forward, U.S. citizens, resident aliens, and legal permanent residents had an obligation to report to the IRS on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether that individual had a financial interest in, or signature authority over, a financial account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained.

Since 1970, U.S. citizens, resident aliens, and legal permanent residents who have had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year have been required to file with the U.S. Department of the Treasury a Report of Foreign Bank and Financial Accounts, FinCEN Form 114, formerly known as Form TD F 90-22.1 (the "FBAR"). The FBAR for the applicable year during the Relevant Period was due on June 30 of the following year.

An IRS Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting, was used by a non-U.S. person to establish foreign status and beneficial ownership, and to claim the benefits of exemption or reduction of tax withholding as a resident of a foreign country with which the United States has an income tax treaty.  U.S. citizens and U.S. residents were not eligible to file Forms W-8BEN.

An IRS Form W-9, Request for Taxpayer Identification Number and Certification, was used by a U.S. person to provide a correct Taxpayer Identification Number to a financial institution required to report to the IRS interest, dividends, and other income earned.

In May 2008, Swiss bank UBS AG ("UBS") publicly announced that it was the target of a criminal investigation by the IRS and the Department of Justice and that it would be exiting and no longer accepting certain U.S. clients.  On February 18, 2009, the Department of Justice and UBS filed a deferred prosecution agreement in the Southern District of Florida in which UBS admitted that its cross-border banking business used Swiss privacy law to aid and assist U.S. clients in opening and maintaining undeclared assets and income from the IRS.  Since the

---

[2] "U.S. Penalty Accounts" are defined as U.S. accounts valued over $50,000 that the parties agree should be subject to a penalty for the offense conduct.

UBS investigation became public, several other Swiss banks have publicly announced that they were or are the targets of similar criminal investigations and that they would likewise be exiting and not accepting certain U.S. clients. These cases have been monitored by banks operating in Switzerland, including the Bank Hapoalim Group, since at least July of 2008.

BHBM was aware that U.S. taxpayers had a legal duty to report assets and income to the IRS, and to pay taxes on the basis of all their income, including income earned from accounts that BHBM maintained on their behalf. BHBM nevertheless opened, serviced, and profited from undeclared accounts belonging to clients that it knew, or should have known, were U.S. taxpayers—including those who BHBM knew, or should have known, were likely not complying with their U.S. tax obligations.

## III.   THE OFFENSE CONDUCT

BHBM conducted a cross-border banking business that assisted certain of its U.S. clients in opening and maintaining undeclared accounts and concealing the assets and income they held in these accounts from the U.S. Government. BHBM knew or had reason to know that some U.S. taxpayers who had opened and maintained accounts at BHBM were not complying with their U.S. income tax and reporting obligations.

### A. **BHBM Solicited U.S. Clients with Undeclared Accounts**

A substantial number of BHBM's U.S. clients maintained accounts at its GPBC in the Hayarkon branch. The GPBC maintained five desks, including the "Anglo Desk," and a desk manager served as the head of each desk, reporting to the Head of the Global Private Banking Center. In addition to U.S. client accounts that were serviced through the GPBC's Anglo Desk, certain larger accounts at other BHBM branches received private banking services, including those that were designated as "Platinum" accounts.

BHBM's relationship managers served as the primary contact for U.S. clients with accounts at BHBM. Certain of these relationship managers assisted or otherwise facilitated some U.S. taxpayers in establishing and maintaining undeclared accounts in a manner designed to conceal the U.S. taxpayers' ownership or beneficial interest in the accounts from the United States Government.

Up to March 2009, certain BHBM relationship managers periodically traveled to the United States to meet with existing U.S. clients for the purposes of opening accounts and servicing those clients' offshore accounts, and, in some instances, to solicit new clients. The U.S. travel, as with all international travel of BHBM employees, was approved by relevant executives at BHBM and paid for by BHBM. Although BHBM's written policy dictated that employees should list the actual purposes of their trips on immigration forms, at least one BHBM employee stated that the employee was told by a superior to list "leisure" on immigration forms when embarking on such trips.

For example, one relationship manager from BHBM's Hayarkon branch routinely traveled to the United States to meet with current U.S. clients, some of whose accounts were undeclared, and to recruit new U.S. clients. During these trips, the relationship manager

typically met with his U.S. clients in a hotel lobby, at their place of business, or in another private location to show them copies of their account balances and to offer BHBM products and services.  As required by BHBM, the relationship manager reported the results of his trips to the United States to his superiors at BHBM upon returning to Israel.

The BHBM Board of Directors was aware of the differences between onshore and offshore private banking.   In a Board of Directors meeting in 2008, an outside consultant said, "It is difficult because the mechanism for Off-Shore is completely different than the mechanism needed for On-Shore.  For Off-Shore, we take advantage of the neutrality of taxation and confidentiality, and the other things are secondary."  In that same meeting, a senior executive attending the meeting "noted that we must recall that there is a difference between On-Shore and Off-Shore private banking.  In On-Shore, the issue is not simply grabbing the money, but rather the overall products and services that must be provided to the customer."   In a May 2009 meeting of the Overseas Banking and International Operations Committee of the Board, the same senior executive stated that "the worldwide trend is of declared money which, for various reasons, such as distribution, security, tax advantages, etc., seeks out other booking centers than those located in the origin country," and "that recently, 'black' money is disappearing from the world, and the game is how to pay less taxes."

## B. BHBM Provided Banking Services that Facilitated Tax Evasion by U.S. Clients

BHBM offered a variety of offshore private banking services that it knew or should have known could assist, and did in fact assist, U.S. clients in the concealment of assets and income from the IRS.  Awareness by BHBM that its services could assist U.S. clients to evade their U.S. taxes is reflected in a memorandum drafted in 1991, which was circulated among some senior BHBM managers (the "1991 Memo").  The 1991 Memo noted that, at that time, BHBM employees solicited deposits from U.S. clients for accounts at BHBM in Israel.  The 1991 Memo further discussed how U.S. clients could use accounts in Israel to facilitate income tax and inheritance tax evasion, and how loans that provided U.S. taxpayers access to undeclared funds held in offshore accounts could aid in tax evasion. The 1991 Memo is referenced in materials circulated at BHBM, including among senior managers, through at least 1998.  Despite this awareness of potential liability under U.S. criminal laws and the consequent need to take appropriate steps to avoid this exposure, BHBM did not take adequate steps to curtail its activities and services involving U.S. taxpayers.  The most significant of these services are set forth below, and some are described in more detail in the sections that follow.

BHBM offered code name or numbered account services, which allowed an account holder to replace his or her identity with a code name or number on bank statements and other documentation sent to the client.  These services helped U.S. clients to eliminate the paper trail associated with the undeclared assets and income they held at BHBM.  By accepting and maintaining such accounts, BHBM assisted some U.S. taxpayers in evading their U.S. tax obligations.  By January 2015, BHBM either blocked or converted to the actual name of the account holder all coded or numbered accounts.  BHBM held 566 coded and/or numbered accounts that were U.S. Penalty Accounts.

Prior to 2007, BHBM employees also opened "encrypted" accounts for which the identities of the account holder and other customers associated with the account were known to

BHBM and registered in BHBM's systems, but where the access to such information was restricted to a limited number of bank employees. During the Relevant Period, BHBM had approximately 160 encrypted accounts that were U.S. Penalty Accounts. The last encrypted account for a U.S. customer was opened in November 2007. By January 2015, BHBM blocked all encrypted accounts that had not yet been closed.

BHBM employees opened accounts for U.S. clients in the names of offshore companies and entities that purported to be non-U.S. persons exempt from U.S. tax laws. Typically, such offshore entities were located in offshore tax haven jurisdictions such as Panama and the British Virgin Islands ("BVI"). In some cases, clients used non-U.S. corporations or trusts to create ownership layers that were designed to conceal, or had the effect of concealing, assets from the United States. During the Relevant Period, BHBM maintained approximately 91 offshore entity accounts for U.S. Penalty Accounts.

BHBM also processed wire transfers or issued checks in amounts of less than $10,000 that were drawn on accounts of U.S. taxpayers or entities, even though BHBM knew, or had reason to know, that the withdrawals were made to avoid triggering scrutiny. There were 724 U.S. Penalty Accounts that conducted such structured transactions.

Another such service was hold mail, where BHBM would hold all correspondence for a particular account, thereby avoiding any correspondence regarding the client's undeclared account being sent to the United States. BHBM charged clients a fee for hold mail services. Almost 59 percent of BHBM's U.S. Penalty Accounts during the Relevant Period (approximately 2,038 accounts) used hold mail services. BHBM did not open new accounts with hold mail services for non-Israeli residents after 2014.

BHBM employees opened and maintained accounts for U.S.-related clients in the names of trusts held at its subsidiary Pashan. Between 2002 and 2008, BHBM maintained approximately 38 Pashan trust accounts that were U.S. Penalty Accounts. Since 2008, Pashan gradually exited its U.S.-client trusts, and by January 2010, Pashan prohibited the opening of trusts held by non-Israeli resident U.S. clients. Pashan did not open new trusts held by U.S. clients after 2009. By 2015, Pashan closed all trust accounts held by U.S. clients.

Set forth below are some examples of the use of BHBM's services to evade taxes:

Example 1: In or around 1990, "Client-1" opened an account at a BHBM branch located in a small town with an initial deposit of $20,000 in cash. The local branch immediately referred the client to a branch in Tel Aviv where he was introduced to a BHBM relationship manager. Thereafter, Client-1 brought approximately $250,000 in cash per year from the United States to Israel in bulk, often depositing in excess of $125,000 per visit. Client-1 also directed some of his U.S.-based business customers to write checks payable to "cash," which he then deposited in his BHBM account through an intermediary. During this time period, the BHBM relationship manager visited him in the United States to provide updates on his account balances. While at BHBM, the client's account had an end-of-year maximum value of approximately $7.5 million in 2001. That BHBM relationship manager serviced Client-1's account at BHBM until the relationship manager transferred to BHS around 2002. Thereafter, Client-1 closed his BHBM accounts and transferred his funds to BHS. The same relationship manager continued to service

his account until he left BHS around 2006.  While at BHS, the relationship manager continued to actively assist Client-1 in evading his U.S. tax obligations.  Thereafter, several different relationship managers at BHS served as Client-1's primary contacts.

Example 2: In the 1980s, "Client-2" opened a BHBM account after meeting a BHBM relationship manager in a New York, NY hotel lobby.  Client-2 continued to meet with the BHBM relationship manager in person through the mid-2000s and those meetings occurred either at New York, NY hotels, at the client's New York office or at a BHBM branch in Israel.  As Client-2 had a hold mail account for which he was charged an annual fee, the BHBM relationship manager provided the client with details regarding his account balance in person.  In or around 1997, Client-2 transferred his funds to an account opened in the name of his sister, a citizen and resident of Iran. Client-2's brother and business partner, who is also a U.S. person with a separate account at BHBM, transferred his funds to their sister's account.  The BHBM relationship manager facilitated the opening of the sister's account and the transfer of funds into that account by providing the client and his brother with documents for signature during a meeting in New York, NY.  During the time that the client and his brother's funds were held in the account in their sister's name, the client accessed his funds through a $437,000 letter of undertaking provided by BHI-USA. That credit facility was secured by Client-2's funds held in his sister's account at BHBM.  Finally, when Client-2's sister decided to emigrate from Iran to the United States around 2005, Client-2 and his brother opened new, separate accounts at BHBM. The various accounts had a maximum aggregate value of $2,088,724 in 2009.

Example 3: In the early 1990s, "Client-3" opened a BHBM account during a trip to Israel, funding the account with a wire transfer from UBS in Switzerland.  In or around 1994, a BHBM relationship manager visited Client-3 at his Los Angeles-area office.  Client-3 signed paperwork to open a second account at that time, which included a copy of his Iranian passport and the client's wife's U.S. passport.  Client-3 funded the new account with additional transfers from his UBS account, except this time the client sent those funds through a Taiwanese company which acted as an intermediary.  Client-3 elected to have a hold mail account for which he was charged an annual fee and the BHBM relationship manager provided details regarding the account balance during periodic visits to Client-3's Los Angeles-area office.  The maximum value of the account was approximately $4.4 million in February 2003.  Client-3 accessed those funds by sending fax instructions to the BHBM relationship manager.  Those fax instructions directed the BHBM relationship manager to transfer funds to the account of a money broker, who then delivered cash to Client-3 in the United States.  Client-3 sent at least one such fax to the BHBM relationship manager for a cash transfer of approximately $50,000.

### C.  BHBM's Qualified Intermediary Agreement and Efforts to Assist U.S. Taxpayers in Avoiding Identification to the IRS Pursuant to BHBM's QI Obligations

In 2001, BHBM entered into a qualified intermediary agreement ("QI Agreement") with the IRS.  The qualified intermediary regime provided a comprehensive framework for U.S. information reporting and tax withholding by a non-U.S. financial institution with respect to U.S. securities.  The QI Agreement was designed to help ensure that, with respect to U.S. securities

held in an account at BHBM, non-U.S. persons were subject to the proper U.S. withholding tax rates and that U.S. persons holding U.S. securities were properly paying U.S. tax.

The QI Agreement took account of the fact that BHBM, like other non-U.S. financial institutions, was prohibited by foreign law from disclosing the identities of account holders.  In general, the agreement required that, if a U.S. account holder wanted to trade in U.S. securities and avoid mandatory U.S. tax withholding, BHBM would have to either (i) obtain the consent of the account holder to disclose the client's identity to the IRS or (ii) the account holder would have to grant BHBM the authority to sell all of the account's U.S. securities (for accounts opened before January 1, 2001) and exclude all U.S. securities from the account (for accounts opened on or after January 1, 2001).  The QI Agreement also required BHBM to obtain IRS Forms W-9 and to undertake IRS Form 1099 reporting for new and existing U.S. clients engaged in U.S. securities transactions.

BHBM established policies and procedures for complying with the QI Agreement.  These policies required U.S. clients who held U.S. securities in accounts to either sign an IRS Form W-9 or authorize BHBM to sell the U.S. securities in their accounts.  BHBM's QI forms specifically allowed clients to elect between the two options.  These policies also required foreign corporations holding U.S. securities to sign IRS Forms W-8BEN to establish both the foreign status and beneficial owner of the account.  Existing U.S. clients and foreign corporations who refused to sign IRS Forms W-9 or W-8BEN were to have their accounts blocked from transacting in U.S. securities.  These policies further barred the opening of any new accounts holding U.S. securities if the U.S. client or foreign corporation refused to sign an IRS Form W-9 or Form W-8BEN.

Notwithstanding the QI Agreement and its policies, BHBM continued to service some U.S. clients who held U.S. securities without disclosing their identities to the IRS, and therefore assisted these U.S. clients in evading their U.S. tax obligations.  In certain cases, BHBM failed to adhere to the requirements of BHBM's QI Agreement with the IRS and BHBM's own QI regulations by (i) not identifying clients holding U.S. securities as U.S. persons, (ii) permitting U.S. clients who had not provided BHBM with the proper IRS Forms W-8BEN and/or W-9 to continue trading in accounts holding U.S. securities, and (iii) failing to timely address QI-related compliance deficiencies in U.S. client accounts holding U.S. securities, including failing to comply with the requirements regarding proper documentation for opening and maintaining accounts holding U.S. securities.

Certain BHBM relationship managers and supervising employees allowed some U.S. clients to create and open accounts in the name of sham offshore entities, trusts, and non-U.S. nominees.  BHBM opened and maintained client accounts for known U.S. clients using non-U.S. forms of identification, which enabled U.S. taxpayers to avoid being identified as U.S. persons, in violation of BHBM's internal policies and the QI Agreement.  In some cases, relationship managers advised U.S. clients to use their non-U.S. passports to open accounts instead of their U.S. passports.  In connection with some of these accounts, certain BHBM employees accepted and included in BHBM's account records IRS Forms W-8BEN (or BHBM's substitute forms) provided by the directors of the offshore companies that falsely represented under penalty of perjury that such

companies were the beneficial owners, for U.S. federal income tax purposes, of the assets in the accounts.

### D.  **BHBM Provided Back-To-Back Loans to U.S. Clients, Used as a Means of Concealed Access to Offshore Funds**

During the Relevant Period, BHBM offered and serviced back-to-back loans that in certain cases were used by U.S. taxpayers to access in the United States their funds held in offshore accounts while continuing to conceal their assets and evade their U.S. tax obligations. A "back-to-back loan" was a loan offered by BHBM's U.S. branches to U.S. customers that was secured by funds in an offshore account maintained by the Bank, generally held by the same U.S. beneficial owner (the "pledge account").  During the Relevant Period, accounts at BHBM secured or collateralized approximately 85 back-to-back loan facilities issued by BHBM's U.S. branches with an approximate value of $191 million.  Certain BHBM employees, including managers, knew or should have known that back-to-back loans allowed U.S. customers to enjoy the economic benefits of the funds in the offshore accounts without directly repatriating the funds or creating a paper trail that could potentially disclose the existence of the undeclared accounts to U.S. authorities.

In 1995, BHI-USA issued a policy requiring that loan files in the United States secured by collateral in other branches of BHBM include information regarding the name of the pledgor, the name of the branch in which the assets were held, the type and amount of assets the customer intended to pledge as collateral, and the stated purpose of the loan. In 2002, BHBM adopted additional procedures requiring the branch in Israel holding the collateral to prepare a letter of undertaking disclosing the name of the pledgor and the collateral account number, and to forward that information to the U.S. branch issuing the loan. As a result of these compliance measures, BHBM customer account information was required to be disclosed in the loan files maintained in the United States. With limited exceptions, BHBM's and BHI-USA's practices were consistent with those policies.

BHBM employees who prepared the loan documents and approved the back-to-back loans were aware in some cases that the borrower and owner of the pledge account were the same person.  In some cases, BHBM employees assisted customers in  circumventing BHBM's policies requiring disclosures of the pledgors of back-to-back loans in the U.S. branch loan file, either by (a) using a trust account held at the Bank as the pledge account, as a result of which the name of the trust account, rather than the trust beneficiary, was disclosed to the U.S. branch issuing the loan; or (b) maintaining the pledge account in the name of a non-U.S. relative of the U.S. customer who was the actual beneficial owner of the funds in the account and granting the U.S. customer a power of attorney over the pledge account, as a result of which the name of the account holder, rather than the beneficial owner, was disclosed to the U.S. branch issuing the loan.

In addition to this issue with disclosure of the pledgor, many of the back-to-back loan files lacked evidence of a legitimate economic rationale.  For example, in September 2006, an internal audit of BHI-USA's Miami branch found that a particular back-to-back loan had no economic purpose evidenced in the loan file.  Despite these findings, BHI-USA continued to issue back-to-back loans, including loans with no discernable economic rationale.

In 2008, following the announcement that Mizrahi Tefahot Bank Ltd. ("Mizrahi Bank") had entered into a Cease & Desist Order with the FDIC and California Department of Financial Institutions in connection with Mizrahi Bank's practices regarding, among other matters, back-to-back loans, BHBM's U.S. branches reexamined their own back-to-back loan practices and determined that the U.S. files of some loans secured by accounts at the Bank Hapoalim Group did not contain sufficient information concerning the collateral accounts. Thereafter, BHBM's Miami branch amended its policies to require bankers to identify all guarantors on loan accounts, and to require anti-money-laundering compliance personnel to ensure that the Miami branch obtained descriptions of the economic purpose of the loan, source of repayment, source and location of the collateral, parties involved in the loan, and tax and financial statements related to the borrower (as applicable). The number of BHBM back-to-back loans decreased following the introduction of post-2008 policy enhancements, and BHBM undertook enhanced scrutiny of the underlying business reasons for requested back-to-back loans. BHBM's compliance with these amended policies was, however, inconsistent.

Set forth below are some examples of the use of back-to-back loans involving BHBM:

Example 1: Between approximately 2002 and December 2008, Client-4, a family of U.S. citizen and resident customers, used a back-to-back loan facility issued by BHI-USA and secured by assets in Client-4's Hapoalim Fiduciary trust account held at BHS in order to conceal their ownership of the assets while repatriating the assets to the United States. The loan facility was terminated in 2009, and BHS closed the accounts in March 2010.

Example 2: Between 1998 and 2007, a BHBM account held by a trust secured a back-to-back loan issued by BHI-USA in New York to a U.S. entity. One of the U.S. shareholders of the U.S. entity, Client-5, was the beneficiary of the trust. Because of the name in which the account was held, the connection between the U.S. borrower and the pledge account was not apparent in the U.S. loan files. In addition, a BHBM relationship manager brought account statements with him during trips from Israel to the United States to meet with Client-5. Beginning in 2000, this same relationship manager, along with other BHBM and Pashan employees, permitted Client-5 to use a code name for himself in correspondence regarding account transactions.

Example 3: BHBM maintained three undeclared accounts for U.S. customer Masud Sarshar, who subsequently pleaded guilty to conspiracy to defraud the United States and corruptly endeavoring to obstruct or impede the due administration of the internal revenue laws for his failure to report more than $20 million in taxable income. Between September 2006 and December 2012, Sarshar maintained undeclared assets of more than $11.5 million at BHBM. The same BHBM relationship manager assigned to the trust accounts in Example 2 was responsible for managing Sarshar's accounts at BHBM. Although BHBM declined a request to issue a back-to-back loan for Sarshar, BHBM provided a guarantee to Bank Leumi, another Israeli bank, in connection with a back-to-back loan issued to Sarshar by Bank Leumi's U.S. subsidiary.

Specifically, in July 2007, Sarshar requested a back-to-back loan of $10 million. BHBM's anti-money laundering ("AML") unit rejected this request after querying what the

"business/economic logic" for the loan was and receiving from the relationship manager the explanation that the loan was requested because of "tax considerations."  In 2009, at Sarshar's request and with the approval of senior BHBM officers, BHBM issued a $10 million letter of guarantee to Bank Leumi as security for the back-to-back loan provided by Bank Leumi's U.S. subsidiary in Los Angeles.  In January 2010, in an effort to discourage Sarshar from transferring his funds from BHBM to Bank Leumi, BHBM agreed to increase the amount of its letter of guarantee by $4.8 million.  A senior BHBM officer approved the increase.

In addition, Sarshar paid a fee to use BHBM's hold mail service, whereby BHBM held mail relating to Sarshar's accounts at one of its Israeli branches.  The relationship manager assigned to Sarshar's accounts brought copies of Sarshar's account statements during visits to the United States, occasionally meeting with Sarshar in Sarshar's car in an effort to maintain the secrecy of the account.

## IV.    POLICIES AND PRACTICES CONCERNING U.S. CUSTOMERS

In early May 2008, the fact that UBS was being investigated by the Department of Justice became public.  UBS disclosed that it was being investigated for, among other things, assisting U.S. taxpayers with evading their taxes.  In July 2008, UBS announced that it was closing its U.S. cross-border banking business.  Thereafter, several other Swiss banks publicly announced that they were the targets of similar criminal investigations and that they likewise would be exiting their U.S. cross-border businesses and not accepting certain U.S. clients.

While BHBM took no systematic or institutional efforts to solicit U.S. clients from UBS or other Swiss banks, between August 2008 and December 2012, it accepted transfers from UBS and other Swiss banks and opened a number of new accounts of U.S. citizens or residents who had not previously held accounts with BHBM.  There were 588 U.S. Penalty Accounts at BHBM that received such transfers from Swiss banks.

In some cases, BHBM personnel failed to take appropriate steps to prevent certain U.S. clients leaving Swiss banks from transferring funds to BHBM in order to continue their evasion of U.S. tax obligations.  Apart from its obligations under the QI Agreements with the IRS and the internal policies it introduced to implement them, prior to late 2009, BHBM did not have sufficient cross-border tax policies for U.S. clients that would have enabled it to ensure the tax compliance of these clients.  BHBM acknowledges that it had compliance deficiencies that prevented it from effectively managing the risks posed by its cross-border banking business with U.S. customers.  These compliance deficiencies enabled U.S. customers to avoid their U.S. tax obligations, and information technology weaknesses hindered BHBM's ability to identify all U.S. accounts.

Following the announcement of UBS's settlements with the Department of Justice and the Securities and Exchange Commission, and subsequent pressure from U.S. clients to open offshore accounts in Israel, BHBM evaluated its policies and practices for conducting business with U.S. customers. In October 2009, the BHBM Board of Management created an American Customers Committee, headed by a member of management, for this purpose.  In late 2009, following the recommendations of the American Customers Committee, BHBM published

instructions prohibiting the opening of accounts for U.S. resident customers without authorization of a senior compliance officer and, for accounts expected to hold more than $100,000, authorization of BHBM's AML unit.  These instructions provided exceptions for U.S. residents temporarily living in Israel as students, military recruits, temporary employees, and corporations whose controlling holders were U.S. persons wishing to conduct business in or with Israel.  In July 2010, BHBM removed the approval requirement for new U.S. resident customer accounts.  BHBM did not reintroduce restrictions on new U.S. customer account openings, which mandated the provision of Forms W-9 and waivers, until January 2012, at which point they were made retroactive to September 2011.  U.S. citizens who were permanent Israeli residents were still permitted under these policies to open new accounts until April 2012, and existing U.S. accounts (whether or not U.S. resident accounts) were not covered by the initial policies.

Although BHBM was not required to report under FATCA prior to 2014, it began implementing the policies and systems required for FATCA reporting in 2011.  In July 2011, BHBM implemented a group-wide policy that specifically prohibited employees from providing advice to U.S. clients aimed at avoiding FATCA requirements.

In November 2011, BHBM management adopted a resolution stating that new and existing U.S. customers would have to provide IRS Forms W-8 or W-9 (as appropriate), as a condition of opening a new account.  This resolution did not explicitly address U.S. citizens who were permanent Israeli residents, but, in April 2012, the application of this policy to such clients was made explicit.  However, in the two years following the introduction of the policy, BHBM opened at least one new high AUM U.S. customer account without obtaining Forms W-9, in contravention of the policy.

In 2012, BHBM introduced a new policy with respect to the treatment of U.S. customers in various aspects of their banking, including, among other things, exits from BHBM.  Under the policy, U.S. customers could not withdraw funds unless the transfer documentation stated the names of all U.S. persons on the account and the fact that they were U.S. persons, and the transfer was made to an account at another bank in a jurisdiction not determined to be "high risk."  Without an IRS Form W-9 and waiver on file, BHBM also only permitted customers to withdraw or transfer their entire account balance and only send funds to an account under the same customers' names outside the Bank Hapoalim Group.  BHBM nevertheless closed some U.S. client accounts via means that were inconsistent with this policy.  In addition, BHBM closed some accounts in ways that, although technically consistent with BHBM's policy, may have facilitated the ability of customers to continue concealing their undeclared assets.

**Exhibit D to Deferred Prosecution Agreement with Bank Hapoalim B.M.**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:  SAGAR K. RAVI
     TIMOTHY D. CAPOZZI
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
United States Department of Justice Tax Division
By:  TODD A. ELLINWOOD, Assistant Chief
     NANETTE L. DAVIS, Senior Litigation Counsel
150 M Street, N.E.
Washington, DC 20002


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                :

                Plaintiff,               :        VERIFIED COMPLAINT

            -v.-                         :        20 Civ. ____

$160,325,378 IN UNITED STATES            :
CURRENCY,
                                         :
                Defendant *in rem*.
- - - - - - - - - - - - - - - - - -x

     Plaintiff United States of America, by its attorneys,

GEOFFREY S. BERMAN, United States Attorney for the Southern

District of New York, and RICHARD E. ZUCKERMAN, Principal Deputy

Assistant Attorney General for the United States Department of

Justice Tax Division, for its Verified Complaint (the

"Complaint") allege, upon information and belief, as follows:

2

## I.  JURISDICTION AND VENUE

1.   This action is brought by the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C), seeking the forfeiture of $160,325,378 in United States Currency (the "Defendant Funds").

2.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

3.   Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

4.   The Defendant Funds constitute proceeds of mail and wire fraud, and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981 (a)(1)(C).

## II.  NATURE OF THE ACTION

5.   As alleged in *United States v. Bank Hapoalim B.M. and Hapoalim (Switzerland) Ltd.*, 20 Cr. ___ (___) (the "Hapoalim Information", attached as Exhibit A and incorporated by reference herein), from at least in or about January 2002 up through and including at least in or about December 2014, Bank Hapoalim B.M. ("BHBM"), an Israeli bank, and Hapoalim (Switzerland) Ltd. ("BHS"), its Swiss subsidiary bank

3

(collectively, "the Bank"), conspired with others known and unknown to defraud the United States of certain taxes due and owing by concealing from the United States Internal Revenue Service ("IRS") undeclared accounts owned by U.S. taxpayers at the Bank.  On or about April [x], 2020, the United States Attorney's Office for the Southern District of New York and the Department of Justice Tax Division (the "Offices") and BHBM entered into a deferred prosecution agreement (the "BHBM DPA," attached as Exhibit B and incorporated by reference herein).  On or about April [x], 2020, the Offices and BHS entered into a plea agreement (the "BHS Plea Agreement," attached as Exhibit C and incorporated by reference herein).

6.    As set forth in the Statements of Facts, attached as an exhibit to the BHBM DPA and BHS Plea Agreement and incorporated by reference herein, the fraud conspiracy alleged in the Hapoalim Information involved the use by U.S. taxpayer-clients of the Bank of the U.S. mails, private or commercial interstate carriers, or interstate wire communications to submit individual federal income tax returns to the IRS that were materially false and fraudulent in that these returns failed to disclose the existence of such taxpayers' undeclared accounts or the income earned in such accounts.

4

### III. THE DEFENDANT-IN-REM

7.    Under the DPA, BHBM agreed to forfeit
$35,696,929.  Under the Plea Agreement, BHS agreed to forfeit
$124,628,449.  The Bank, pursuant to the DPA and Plea Agreement,
transferred the Defendant Funds to the United States in the
Southern District of New York as a substitute *res* for gross
proceeds from its scheme to defraud the United States as set
forth in the Hapoalim Information.  The Bank agrees that the
Defendant Funds are subject to civil forfeiture to the United
States pursuant to 18 U.S.C. § 981(a)(1)(C) as proceeds of mail
and wire fraud.

### IV.   CLAIM FOR FORFEITURE

8.    The allegations contained in paragraphs one
through seven of this Verified Complaint are incorporated by
reference herein.

9.    Title 18, United States Code, Section
981(a)(1)(C) subjects to forfeiture "[a]ny property, real or
personal, which constitutes or is derived from proceeds
traceable to a violation of . . . any offense constituting
'specified unlawful activity' (as defined in section 1956(c)(7)
of this title), or a conspiracy to commit such offense."

5

10.  "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include any offense under 18 U.S.C. § 1961(1).  Section 1961(1) lists as offenses both mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

11.  By reason of the above, the Defendant Funds are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C).

WHEREFORE, plaintiff the United States of America prays that process issue to enforce the forfeiture of the defendant *in rem* and that all persons having an interest in the defendant *in rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decrees forfeiture of the defendant *in rem* to the United States of America for disposition according to law, and that this Court

6

grant plaintiff such further relief as this Court may deem just
and proper.

Dated:     New York, New York
           _____, 2020

                        GEOFFREY S. BERMAN
                        United States Attorney for
                        Plaintiff United States of America


           By:     _____
                        SAGAR K. RAVI
                        TIMOTHY D. CAPOZZI
                        Assistant United States Attorneys
                        One St. Andrew's Plaza
                        New York, New York 10007
                        (212) 637-2200

                        RICHARD E. ZUCKERMAN
                        Principal Deputy Assistant
                        Attorney General for Plaintiff
                        United States of America


           By:     _____
                        TODD A. ELLINWOOD, Assistant
                        Section Chief
                        NANETTE L. DAVIS, Senior
                        Litigation Counsel
                        (202) 616-9330/514-8030

VERIFICATION

AMY LINDNER, pursuant to Title 28, United States Code,
Section 1746, hereby declares under penalty of perjury that she
is a Special Agent with the Internal Revenue Service, Criminal
Investigation; that she has read the foregoing Verified
Complaint and knows the contents thereof; that the same is true
to the best of her knowledge, information and belief; and that
the sources of her information and the grounds of her belief are
her personal involvement in the investigation, and conversations
with and documents prepared by law enforcement officers and
others.

Executed on _____, 2020.


_____
AMY LINDNER
Special Agent
Internal Revenue Service,
Criminal Investigation